PEOPLE v BUIE (AFTER REMAND)

Docket No. 278732. Submitted October 14, 2010, at Lansing. Decided
January 11, 2011, at 9:10 a.m.

James Henry Buie was convicted after a jury trial in the Kent Circuit
Court, Dennis B. Leiber, J., of two counts of first-degree criminal
sexual conduct involving a victim under the age of 13, three counts
of first-degree criminal sexual conduct involving the use of a
weapon, and possession of a firearm during the commission of a
felony. Defendant appealed, alleging, in part, that he was deprived
of his constitutional right to confront the witnesses against him
when the court allowed two nonvictim prosecution witnesses to
testify by way of two-way, interactive video technology. The Court
of Appeals, BECKERING, P.J., and WHITBECK and M. J. KELLY, JJ., held
the record was insufficient to determine whether the procedure
was necessary to further an important public policy or state
interest, and remanded to the trial court for further fact-finding.
285 Mich App 401 (2009). Both parties sought leave to appeal in
the Supreme Court, but both applications were denied, and the
Supreme Court further instructed the trial court to make findings
regarding the good-cause and consent requirements of MCR
6.006(C). 485 Mich 1105 (2010). At the evidentiary hearing on
remand, the proofs showed that both witnesses would have testi-
fied in person had the video technology not been available,
although it would have been inconvenient. Defense counsel testi-
fied that the video testimony was the best way to have the two
witnesses testify because the case had already proceeded slowly
and that the technology allowed her to effectively cross-examine
them. She testified that defendant objected to the use of the video
technology and that he had been uncooperative throughout the
proceedings in general. The court issued an opinion and order
holding that there was no error in permitting the video procedure
because it furthered several state interests or public policies and
defendant consented to the procedure.

After remand, the Court of Appeals *held*:

1. An accused person has a constitutional right to confront the
witnesses against him or her under US Const, Am VI and Const
1963, art 1, § 20. When determining whether the right of confron-
tation would be infringed by permitting testimony by means of

two-way, interactive video technology, a trial court must hear evidence and make case-specific findings that the use of such technology is necessary to further a public policy or state interest important enough to outweigh the defendant's right of confrontation and that it preserves all the other elements of the Confrontation Clause. The state interests cited by the trial court—convenience, cost savings, efficiency, and avoiding delay—did not constitute interests important enough to outweigh defendant's right of confrontation.

2. Under MCR 6.006(C), a court may take trial testimony by way of two-way, interactive video technology when the defendant is present in the courtroom or has waived the right to be present if there is a showing of good cause and the parties consent. Defense counsel may waive a defendant's right of confrontation, but only if the waiver is a legitimate trial tactic or strategy and the defendant does not object to the decision. Although defense counsel agreed to the use of the technology, defendant objected to it and had counsel place his objection on the record. The trial court erred in concluding that defendant had consented through his counsel's assent to using the technology. Because the challenged testimony was highly relevant to establishing the essential element of identity, the error warrants reversal.

Reversed and remanded for a new trial.

WHITBECK, J., concurring, emphasized the importance of, and the historical basis for, adherence to the constitutional requirement that an accused has the right to confront the witnesses against him or her.

1. CONSTITUTIONAL LAW — CONFRONTATION CLAUSE — TRIAL — WITNESSES — TWO-WAY, INTERACTIVE VIDEO TECHNOLOGY.

An accused person has a constitutional right to confront the witnesses against him or her; when determining whether the right of confrontation would be infringed by permitting testimony by means of two-way, interactive video technology, a trial court must hear evidence and make case-specific findings that the use of such technology is necessary to further a public policy or state interest important enough to outweigh the defendant's right of confrontation and that it preserves all the other elements of the Confrontation Clause (US Const, Am VI; Const 1963, art 1, § 20).

2. TRIAL — WITNESSES — TESTIMONY — TWO-WAY, INTERACTIVE VIDEO TECHNOLOGY.

A court may take trial testimony by way of two-way, interactive video technology when the defendant is present in the courtroom

or has waived the right to be present if there is a showing of good cause and the parties consent; defense counsel may waive a defendant's right of confrontation, but only if the waiver is a legitimate trial tactic or strategy and the defendant does not object to the decision (MCR 6.006[C]).

*Bill Schuette*, Attorney General, *B. Eric Restuccia*, Solicitor General, *William A. Forsyth*, Prosecuting Attorney, and *Timothy K. McMorrow*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Jonathan Sacks*) for defendant.

AFTER REMAND

Before: BECKERING, P.J., and WHITBECK and M. J. KELLY, JJ.

PER CURIAM. Defendant appeals as of right his jury trial convictions of two counts of first-degree criminal sexual conduct (CSC) involving a victim under the age of 13, MCL 750.520b(1)(a), three counts of first-degree CSC involving the use of a weapon, MCL 750.520b(1)(e), and possession of a firearm during the commission of a felony, MCL 750.227b. When defendant first appealed to this Court, he argued that the trial court erred in permitting Dr. Vincent Palusci and Rodney Wolfarth to testify by way of two-way, interactive video technology. Specifically, defendant argued that the testimony violated his constitutional right of confrontation and was not properly admitted under any state statute or court rule. Retaining jurisdiction, we remanded for the trial court to determine whether permitting the video procedure was necessary to further an important public policy or state interest. *People v Buie*, 285 Mich App 401, 418; 775 NW2d 817 (2009). Our Supreme Court denied plaintiff and defendant leave to

appeal, but instructed the trial court to also "make findings regarding good cause and consent pursuant to MCR 6.006(C)" on remand. *People v Buie*, 485 Mich 1105, 1106 (2010). Following an evidentiary hearing, the trial court issued an opinion and order holding that there was no error in permitting the video procedure because it furthered several state interests or public policies and defendant consented to the procedure. We disagree with the trial court's holding. Because permitting the video procedure cannot be deemed harmless error, we must vacate defendant's convictions and sentence and remand for a new trial.

I

Defendant was convicted of sexually assaulting BS and minors LS, age 13, and DS, age 9. According to the testimony at trial, on June 27, 2001, defendant held BS at gunpoint in a closet, penetrated her vagina with his penis, and attempted to penetrate her anally. Defendant subsequently penetrated LS's vagina with his penis and attempted to penetrate her anally. He then penetrated DS's vagina with his penis. At trial, BS identified defendant as the man who assaulted her, LS, and DS. She testified that she had never seen him before the night of the assaults and had not seen him since that night. LS and DS were unable to identify the man who assaulted them.

Dr. Palusci examined LS and DS within hours of the assaults, Wolfarth conducted DNA testing on the swabs collected by Dr. Palusci, as well as other evidence, and both testified regarding their findings. As we detailed in our earlier opinion:

Dr. Vincent Palusci examined LS and DS approximately six hours after the assaults. Dr. Palusci testified that his findings "were indicative of sexual conduct of direct

trauma to the genitals, and in the case of [LS], also her anus, which were not explainable in any other manner than the histories provided" by the girls. Christine Dunnick, a forensic nurse, examined BS after the assaults and found a "half a centimeter perianal tear, which is near the anal opening," consistent with the history provided by BS. Dr. Palusci and nurse Dunnick collected evidence, including vaginal and rectal swabs, during the examinations and placed the evidence in rape kits. The kits were then sealed and released to the appropriate law enforcement agencies.

The trial court designated Rodney Wolfarth as an expert in the area of DNA analysis. Wolfarth conducted DNA testing on the swabs in the rape kits and the nightgown worn by LS during the assaults, as well as a fitted sheet, a pillowcase, and cigarette butts found at the scene. Wolfarth testified that he found sperm cells in the vaginal and rectal swabs taken from LS. When he tested the sperm cells from the rectal swab, "it was consistent with a mixture and the mixture was consistent with [LS] and an unknown semen donor, designated as Donor 1." Wolfarth found the same mixture on the nightgown and found DNA from Donor 1 on the fitted sheet, pillowcase, and cigarette butts. Wolfarth was unable to identify a match for the DNA at that time, but stated that once DNA testing is completed, the "probative DNA result is entered into what is a DNA data bank called CODIS, which stands for Combined DNA Indexing System." The data are stored to allow for comparisons to convicted felons' profiles at a later date. When a match is made between a DNA sample and a known profile, it is referred to as a CODIS hit.

At trial, prosecution witness LB testified that defendant sexually assaulted her in 2004, when she was 13 years old. LB told her sister that defendant had assaulted her and, shortly thereafter, the incident was reported to the police. DNA analysts subsequently determined that defendant's DNA matched sperm cells from LB's vaginal swab and underwear. The results of the DNA testing were entered into CODIS.

On February 1, 2005, a CODIS hit occurred when the system matched defendant's DNA to the DNA samples taken in this case. Thereafter, a search warrant to conduct

a buccal swab for defendant's DNA was obtained. Defendant was initially uncooperative, but eventually consented to the swab. Joel Schultze, who was designated by the trial court as an expert in DNA analysis, testified that the DNA sample was tested and compared to Wolfarth's previous findings. According to Schultze, the DNA material on the nightgown, pillowcase, fitted sheet, and cigarette butts were [sic] consistent with defendant's DNA. In addition, the rectal swab taken from LS was consistent with a mixture of LS and defendant at 10 of 13 locations. Defendant's DNA was not found on any of the swabs taken from DS, but Schultze explained that even if penetration occurs, "if there's no ejaculation, the male DNA is not going to be there." [*Buie*, 285 Mich App at 404-406.]

The trial court permitted Dr. Palusci and Wolfarth to testify by way of two-way, interactive video technology. Before the first witness testified, defense counsel stated: "[M]y client has—wanted to question the veracity of these proceedings, so I'll leave that to the Court's discretion."

Following his jury trial, defendant was convicted as previously stated. He then appealed his convictions and sentence in this Court, arguing that Dr. Palusci's and Wolfarth's video testimony violated his constitutional right of confrontation and was not properly admitted under any state statute or court rule. We adopted the test articulated in *Maryland v Craig*, 497 US 836; 110 S Ct 3157; 111 L Ed 2d 666 (1990), to determine whether a trial court infringes on a defendant's right of confrontation when it allows witness testimony to be taken by way of two-way, interactive video technology. *Buie*, 285 Mich App at 415. We held that a "trial court must hear evidence and make case-specific findings that the procedure is necessary to further a public policy or state interest important enough to outweigh the defendant's constitutional right of confrontation and that it pre-

serves all the other elements of the Confrontation Clause." *Id.* Additionally, we held that

> [p]ursuant to the plain language of MCR 6.006(C)(2), a trial court may take witness testimony by two-way, interactive video technology if: (1) the defendant is either present in the courtroom or has waived the right to be present, (2) there is a showing of good cause, and (3) the parties consent. [*Id.* at 417.]

Based on the record before us at the time, we could not determine that there was a showing of good cause or that defendant consented. *Id.* We remanded the case, ordering the trial court to determine whether permitting the video procedure was necessary to further an important public policy or state interest. *Id.* at 418. Defendant subsequently filed an application for leave to appeal in the Supreme Court. The Supreme Court denied the application, but instructed the trial court to also "make findings regarding good cause and consent pursuant to MCR 6.006(C)." *Buie*, 485 Mich at 1106.

On remand, the trial court held an evidentiary hearing. The parties stipulated that at the time of trial, Dr. Palusci worked at Wayne State University in Detroit, Michigan and Wolfarth worked at the Virginia State Crime Lab in the western part of Virginia. Although it would have been inconvenient, both witnesses would have testified in person if videoconferencing had not been available.

The prosecutor assigned to this case at the time of trial testified that although he and defense counsel discussed the use of the video technology, he could not recall the specifics of their discussions. He recalled informing defense counsel that testifying in person would be inconvenient for Dr. Palusci and Wolfarth. He also recalled defense counsel stating that she believed Dr. Palusci's testimony would be damaging to the

defense and wanted the testimony to be "done with as quickly as possible." The prosecutor testified that he would never arrange for a witness to testify by way of video technology without first obtaining a stipulation from defense counsel. Defendant was not included in the prosecutor's discussions with defense counsel.

Defendant's trial counsel testified that she discussed the use of the video technology with the prosecutor and the trial court in chambers before trial. She testified that this case had proceeded very slowly for a number of reasons. She understood that it would be problematic and time consuming for Dr. Palusci and Wolfarth to testify in person, although not impossible, and agreed with the prosecutor that utilizing the technology "would be the best way to have these individuals testify without subjecting them to being here physically." Defense counsel testified that because of the nature of the witnesses' testimony, and her ability to cross-examine them effectively by way of the technology available, she had no reason to object to its use.

Defense counsel further testified that she discussed the video technology with defendant before the witnesses testified, despite the fact that he had been uncooperative with her and the proceedings in general. According to defense counsel, although she did not personally object to the use of the technology, defendant "objected to everything." Whenever he objected to something, she placed an objection on the record on his behalf, and she specifically "made a statement on the record indicating [his] disdain for the two individuals testifying via video." When asked whether her statement at trial that her client "wanted to question the veracity of these proceedings" was an expression of defendant's objection to the use of the technology, she testified: "Absolutely." She explained that defendant

"had a problem with every piece of this case." She did not believe that he had a problem with the technology in particular, but that "he had a problem with the fact that he was on trial for raping two little girls," although she could not "get into his mind."

Defendant testified that defense counsel informed him of the video testimony immediately before it took place. Defendant told counsel that it "didn't feel right" to have witnesses testify from outside of the courtroom and requested that she object. In response to his request, counsel made the statement regarding defendant questioning the veracity of the proceedings.

After the evidentiary hearing, the trial court issued a written opinion and order holding that there was no error in permitting the witnesses' video testimony. The court held that there were "state interests or public policies" justifying the use of the video technology in this case. Additionally, the court held that there was good cause for utilizing the technology and that "defendant ultimately consented to the video testimony" under MCR 6.006(C). The court explained that defense counsel had consented to the use of the technology before trial, that when counsel stated that her client "wanted to question the veracity of these proceedings, so I'll leave that to the Court's discretion," defendant was actually agreeing—through counsel—to the use of the technology, and that defendant's "intent was to object to the proceedings in general because he disliked being prosecuted."

Having retained jurisdiction, we now have this case before us to review the trial court's findings on remand and the record as supplemented.

II

On appeal, defendant argues that the trial court erred in permitting Dr. Palusci and Wolfarth to testify

by way of the two-way, interactive video technology. According to defendant, the testimony violated his constitutional right of confrontation and was not properly admitted under any state statute or court rule. As we stated in our earlier opinion, because defendant failed to object to the use of the video technology on the grounds he raises on appeal, the issue is unpreserved. *Buie*, 285 Mich App at 407, citing *People v McPherson*, 263 Mich App 124, 137; 687 NW2d 370 (2004). Therefore, our review is for plain error. See *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

> To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. . . . Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error " 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." [*Id.* at 763 (citations omitted).]

We review the trial court's factual findings on remand for clear error, *People v Sexton (After Remand)*, 461 Mich 746, 752; 609 NW2d 822 (2000), and its rulings on questions of constitutional law de novo, *People v Bryant*, 483 Mich 132, 138; 768 NW2d 65 (2009). To the extent the court engaged in interpretation of MCR 6.006(C), our review is de novo. See *Wilcoxon v Wayne Co Neighborhood Legal Servs*, 252 Mich App 549, 553; 652 NW2d 851 (2002).

III

In our earlier opinion, we adopted the test articulated in *Craig*, 497 US 836, to determine whether a defen-

dant's constitutional right of confrontation is infringed when testimony is permitted to be taken by way of two-way, interactive video technology. *Buie*, 285 Mich App at 415. Pursuant to the two-prong *Craig* test, we held that a trial court must hear evidence and make case-specific findings that the use of such technology is necessary to further a public policy or state interest important enough to outweigh the defendant's right of confrontation and that it preserves all of the other elements of the Confrontation Clause. *Id.* On remand, the trial court held that, given the nature of the witnesses' testimony, the size of the screen on which the witnesses appeared, and the parties' ability to effectively question the witnesses, there were "state interests or public policies" justifying the use of the video technology in this case, specifically cost savings, efficiency, the convenience of the witnesses, and avoiding delay.

Defendant argues that the trial court erred in concluding that there were public policies or state interests at issue that were important enough to outweigh his constitutional right of confrontation. The prosecution does not refute this argument. In its proposed findings of fact, filed after the evidentiary hearing on remand, the prosecution conceded that it "presented no specific state interest invoked for having Dr. Palusci and Mr. Wolfarth testify via video rather than in person. Rather, it was done for convenience, but only after an agreement was reached with defense counsel . . . ." In its supplemental brief on appeal, the prosecution again conceded that it did not present "a 'public policy or state interest' in having [the witnesses] testify by video." It further stated: "The trial court's findings of fact after the hearing on remand identified the cost and expense as important public policies and state inter-

ests. . . . We are not arguing that those interests override a true constitutional mandate . . . ."[1]

Additionally, we note that the trial court failed to separate the two prongs of the *Craig* test in reaching its conclusion. At both the evidentiary hearing on remand and in its written opinion and order, the court emphasized the parties' ability to question the witnesses and the jury's ability to see and hear the witnesses on the video screen. In doing so, the court addressed the *second* prong of the *Craig* test, which is that the video technology utilized adequately protected the elements of the Confrontation Clause other than the element of physical presence, i.e., the oath, cross-examination, and the ability of the trier of fact to view the demeanor of the witness. See *Buie*, 285 Mich App at 408, 415. Importantly, however, the trial court did not explain how the particular interests it cited, i.e., cost savings, efficiency, the convenience of the witnesses, and avoiding delay, constituted public policies or state interests important enough to outweigh defendant's right to confrontation under the *first* prong of the *Craig* test. As we described in our earlier opinion, this Court has held that the right to confrontation must, under certain circumstances, give way to important interests such as protecting a victim witness from being traumatized. See, e.g., *People v Pesquera*, 244 Mich App 305, 312-313; 625 NW2d 407 (2001), and *People v Burton*, 219 Mich App 278, 289; 556 NW2d 201 (1996). Here, the trial court failed to articulate how the interests it cited were equally important.

Considering that neither party appears to agree with the trial court's conclusion on this issue, and the court's

---

[1] Alternatively, the prosecution argued that the interests cited by the trial court constituted "good cause" for permitting video testimony under MCR 6.006(C).

failure to properly address the first prong of the *Craig* test in reaching its conclusion, we decline to hold that there was a public policy or state interest at issue in this case important enough to outweigh defendant's right of confrontation.

IV

Aside from finding a public policy or state interest important enough to outweigh a defendant's constitutional right to confrontation, a trial court may utilize two-way, interactive video technology to take trial testimony under MCR 6.006(C).[2] Pursuant to the plain language of the court rule, a court may take trial testimony by way of such technology "if: (1) the defendant is either present in the courtroom or has waived the right to be present, (2) there is a showing of good cause, and (3) the parties consent." *Buie*, 285 Mich App at 417. Based on the record before us when we issued our earlier opinion, we could not determine that there was a showing of good cause or that defendant consented to the use of the video technology in this case. *Id.* Pursuant to the Supreme Court's order, the trial court considered the issue on remand. The trial court held that good cause to utilize the video technology existed and that defendant consented to its use through counsel.

---

[2] MCR 6.006(C) provides, in relevant part:

As long as the defendant is either present in the courtroom or has waived the right to be present, upon a showing of good cause, district and circuit courts may use two-way interactive video technology to take testimony from a person at another location in the following proceedings:

\* \* \*

(2) with the consent of the parties, trials. A party who does not consent to the use of two-way interactive video technology to take testimony from a person at trial shall not be required to articulate any reason for not consenting.

Even if good cause could be established in this case, we disagree with the trial court on the issue of consent. In our earlier opinion, we noted the rule articulated in *People v Lawson*, 124 Mich App 371; 335 NW2d 43 (1983), that the "integral elements of the Confrontation Clause, including seeing the witness's demeanor, 'must be personally waived by the defendant.' " *Buie*, 285 Mich App at 418, citing and quoting *Lawson*, 124 Mich App at 376. Because the *Lawson* Court ultimately held that the error in the case was harmless, the personal waiver rule articulated by that panel is dictum and is, therefore, not binding. As the prosecution points out, a majority of the federal courts of appeals and state courts that have considered whether defense counsel may waive a defendant's constitutional right of confrontation have held that counsel may waive the defendant's right. See *State v Campbell*, 208 Ill 2d 203, 212-217; 802 NE2d 1205 (2003), and the cases cited therein. It is crucial to note, however, that the courts that have reviewed this issue have overwhelmingly held that defense counsel may only waive a defendant's right of confrontation if the waiver is a legitimate trial tactic or strategy *and* the defendant does not object to the decision. See *id*. We find the reasoning of the majority of the federal and state courts that have reviewed this issue to be persuasive.[3]

Additionally, aside from the constitutional right of confrontation implicated in this case, MCR 6.006(C)

---

[3] We note that in stating that "the more integral rights of the confrontation clause must be personally waived by the defendant," *Lawson*, 124 Mich App at 376, the *Lawson* Court relied on *Brookhart v Janis*, 384 US 1, 7-8; 86 S Ct 1245; 16 L Ed 2d 314 (1966), which held that defense counsel may not "waive his client's constitutional right to plead not guilty and have a trial in which he can confront and cross-examine the witnesses against him" over the defendant's expressed desire to the contrary.

does not permit defense counsel to consent to the use of two-way, interactive video technology where a defendant objects to the procedure. MCR 6.006(C)(2) provides that a court may take trial testimony by way of such technology "with the consent of the parties." MCR 6.003(1) indicates that the term "[p]arty," as used in MCR 6.006, "includes the lawyer representing the party." Thus, the term "parties" in MCR 6.006(C)(2) encompasses both the lawyer and the client that the lawyer represents. While it may be permissible for a lawyer to consent to the use of two-way, interactive video technology on behalf of his or her client, we cannot interpret MCR 6.006(C)(2) to mean that the lawyer may consent to the use of such technology over the express objection of the client.

In this case, the trial court held that defendant consented to the video procedure through counsel. Indeed, defense counsel testified at the evidentiary hearing on remand that she initially agreed to the use of the technology, she had no reason to object to its use, and she never personally objected. But counsel further testified that defendant expressed disagreement with the use of the technology and requested that she object, and that her statement at trial that her client "wanted to question the veracity of these proceedings, so I'll leave that to the Court's discretion," was "[a]bsolutely" an expression of defendant's objection to the use of the technology. Defense counsel later explained that she believed defendant asked her to object, not because he had a problem with the technology in particular, but because he had a problem with being on trial in general. We note, however, as did defense counsel herself, that this was merely counsel's opinion regarding the reason for defendant's objection, as she could not "get into his mind." Defendant testified at the evidentiary hearing that he asked defense counsel to object to the use of the

video technology because it "didn't feel right" to have witnesses testify from outside of the courtroom. Moreover, MCR 6.006(C)(2) specifically states that "[a] party who does not consent to the use of two-way interactive video technology to take testimony from a person at trial shall not be required to articulate any reason for not consenting."

Given the testimony of both defendant and defense counsel at the evidentiary hearing on remand, we cannot conclude that defendant consented to the video procedure through counsel. To the contrary, defendant objected to the use of the technology and had counsel place his objection on the record. Because defendant expressly objected to the use of the technology, defense counsel's agreement with its use does not qualify as a waiver of defendant's constitutional right of confrontation or as consent under MCR 6.006(C)(2). Accordingly, we hold that the trial court plainly erred in permitting Dr. Palusci and Wolfarth to testify by way of two-way, interactive video technology at trial.

V

Finally, we must determine whether the trial court's error in permitting Dr. Palusci's and Wolfarth's video testimony warrants reversal. Reversal is warranted when plain, forfeited error resulted in the conviction of an actually innocent defendant or "seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Carines*, 460 Mich at 763 (edits, quotation marks, and citation omitted). This requirement "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.*

Dr. Palusci testified that he swabbed the minor victims for DNA evidence. Wolfarth testified that he conducted the initial DNA testing on the swabs collected by Dr. Palusci and other pieces of evidence collected from the scene to establish the presence of "Donor 1's" DNA. Wolfarth explained that when he tested the sperm cells from LS's rectal swab, it was consistent with a mixture of LS's DNA and the DNA of an unknown semen donor, designated as Donor 1. Wolfarth also found DNA from Donor 1 on some of the other evidence collected from the scene. We find that without this foundational testimony, the prosecution could not have established a chain of custody, explained the CODIS hit that occurred when the system matched defendant's DNA to Donor 1's DNA, or presented Schultze's testimony comparing defendant's DNA to Wolfarth's findings. Schultze explained that defendant's DNA was consistent with the DNA previously designated by Wolfarth as Donor 1's DNA.

Although BS identified defendant as the man who assaulted her, LS, and DS, she testified that she had never seen defendant before the night of the assaults and had not seen him since that night. LS and DS were unable to identify the man who assaulted them. Thus, the testimony of Dr. Palusci and Wolfarth, which was foundational to Schultze's testimony linking defendant to the assault on LS and the scene of the crime, was highly relevant to establishing the essential element of identity in this case. Considering the importance of the challenged testimony, we must conclude that the trial court's error in utilizing the video technology at issue " 'seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings' independent of the defendant's innocence," *id.* (citation omitted), and, therefore, warrants reversal.

We vacate defendant's convictions and sentence and remand for a new trial. We do not retain jurisdiction.

Whitbeck, J. (*concurring*). I concur in the majority's scholarly opinion. I write separately only to emphasize the importance of, and the historical basis for, adherence to the constitutional requirement that an accused has the right to confront the witnesses against him.[1]

For a wide variety of reasons, our jurisprudence contains an interlocking web of rights and restrictions, all aimed at protecting those whom the state accuses of crimes. We require that when investigation turns to custodial interrogation, the police must inform the subject of that interrogation that he or she has the rights to remain silent and to the services of an attorney.[2] And there is a constitutional prohibition against unreasonable search and seizure.[3] Further, a criminal defendant has a constitutional right to a public trial by an impartial jury.[4] That defendant has a constitutional right against compelled self-incrimination and a concomitant presumption of innocence.[5] He or she has a constitutional due process right to be convicted only upon prosecutorial proof of guilt beyond a reasonable doubt,[6] a right to a unanimous jury verdict,[7] a constitu-

---

[1] US Const, Am VI; Const 1963, art 1, § 20.

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[3] US Const, Am IV; Const 1963, art 1, § 11.

[4] US Const, Am VI; Const 1963, art 1, § 20.

[5] *People v Fields*, 450 Mich 94, 108; 538 NW2d 356 (1995), citing US Const, Am V; Const 1963, art 1, § 17.

[6] *Sandstrom v Montana*, 442 US 510, 520-524; 99 S Ct 2450; 61 L Ed 2d 39 (1979).

[7] *People v Cooks*, 446 Mich 503, 510-511; 521 NW2d 275 (1994), citing US Const, Am VI; Const 1963, art 1, § 14; FR Crim P 31(a); and MCR 6.410(B).

tional right to compulsory process,[8] and a constitutional right to effective assistance of counsel.[9]

These protections continue even after conviction. In Michigan, a criminal defendant has an absolute right of appeal following conviction[10] and to the reasonable assistance of counsel in perfecting and prosecuting such an appeal.[11] Conversely, the prosecution has no constitutional right to appeal.[12]

Thus, the right at issue in this case, the constitutional "confrontation clause"[13] as it is popularly called, is only one strand in this interlocking web of rights and restrictions. But it is an important strand and one steeped in history. "The right to confront one's accusers is a concept that dates to Roman times."[14] The origins of the clause itself go back to the sixteenth and seventeenth centuries. During that time, the English Crown "used criminal proceedings as weapons against its political enemies," most notoriously through the device of the Star Chamber.[15] Essentially, the English courts used an inquisitorial mode of criminal procedure in which, for example, "justices of the peace would interrogate witnesses pri-

---

[8] Const 1963, art 1, § 20.

[9] *Strickland v Washington*, 466 US 668, 687-688; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 309, 312-313; 521 NW2d 797 (1994).

[10] Const 1963, art 1, § 20.

[11] *Id.*

[12] *People v Richmond*, 486 Mich 29, 36; 782 NW2d 187 (2010).

[13] US Const, Am VI; Const 1963, art 1, § 20.

[14] *Crawford v Washington*, 541 US 36, 43; 124 S Ct 1354; 158 L Ed 2d 177 (2004), citing *Coy v Iowa*, 487 US 1012, 1015; 108 S Ct 2798; 101 L Ed 2d 857 (1988), and Herrmann & Speer, *Facing the accuser: Ancient and medieval precursors of the Confrontation Clause*, 34 Va J Int'l L 481 (1994).

[15] Counseller & Rickett, *The Confrontation Clause after Crawford v Washington: Smaller mouth, bigger teeth*, 57 Baylor L R 1, 7 (2005).

vately and offer the testimony against the accused at trial without calling the witness to the stand."[16]

The 1603 trial of Sir Walter Raleigh provides perhaps the most well-known instance of the potential for abuse inherent in the inquisitorial mode.[17] The main witness against Raleigh never testified in person at the trial.[18] Rather, officers reported his statements in court.[19] Raleigh objected to the use of these out-of-court statements—saying at one point, "Good my Lords, let my accuser come face to face and be deposed"[20]—but his objections were unsuccessful, and he was convicted and executed.[21]

Rather clearly, Raleigh's trial demonstrates the twin evils caused by the inability to confront witnesses:

> First, without confrontation by cross-examination, the accused is unable to test the credibility of the declarant's testimony. Confrontation by cross-examination is needed to ensure the reliability of testimony. Second, without a right to confrontation the government may develop ex parte testimony for use against the accused at trial. The right to confrontation serves as a check on the government's ability to secretly develop evidence against its citizenry, a worthwhile purpose, irrespective of the reliability of the testimony.[22]

The proposed Federal Constitution did not originally contain a confrontation clause. But the First Congress included the clause in the proposal that became the Sixth Amendment.[23] Early state decisions indicated

---

[16] *Id.*

[17] *Crawford*, 541 US at 44; Counseller & Rickett, 57 Baylor L R at 7-8.

[18] *Crawford*, 541 US at 44; Counseller & Rickett, 57 Baylor L R at 7.

[19] *Crawford*, 541 US at 44; Counseller & Rickett, 57 Baylor L R at 7.

[20] 1 Criminal Trials 389-520, 427 (David Jardine ed, 1850).

[21] *Crawford*, 541 US at 44; Counseller & Rickett, 57 Baylor L R at 7-8.

[22] Counseller & Rickett, 57 Baylor L R at 8.

[23] *Crawford*, 541 US at 49.

that the right to cross-examine witnesses in person was at the core of the original understanding of the clause.[24] And subsequent United States Supreme Court decisions followed this understanding:

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." Certainly none of the authorities discussed above acknowledges any general reliability exception to the common-law rule. Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.[25]

Indeed, as Justice Scalia opined, the "text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts."[26]

---

[24] *Id.* at 49-50, citing *State v Webb*, 2 NC 103, 104 (1794), to the effect that, " '[I]t is a rule of the common law, founded on natural justice, that no man shall be prejudiced by evidence which he had not the liberty to cross examine,' " and *State v Campbell*, 30 SCL 124, 125 (1844) to the effect that one of the " 'indispensable conditions' implicitly guaranteed by the State Constitution was that 'prosecutions be carried on to the conviction of the accused, by witnesses confronted by him, and subjected to his personal examination.' "

[25] *Crawford*, 541 US at 61; see also *Mattox v United States*, 156 US 237, 244; 15 S Ct 337; 39 L Ed 409 (1895) ("The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination. This, the law says, he shall under no circumstances be deprived of . . . .").

[26] *Crawford*, 541 US at 54.

But technology has intruded and public policy concerns have surfaced. In *Maryland v Craig*,[27] the United States Supreme Court faced the question whether the confrontation clause categorically prohibited a child witness in a child abuse case from testifying against a defendant at trial outside the defendant's physical presence, by one-way closed-circuit television. A majority of the Court held that there was no such categorical prohibition.[28] The majority adopted a two-pronged test to determine if allowing a child witness's testimony outside the defendant's physical presence by one-way closed-circuit television in a sexual abuse case violated the Confrontation Clause. The Court delineated four elements of the Confrontation Clause: (1) physical presence, (2) an oath, (3) cross-examination, and (4) "observation of demeanor by the trier of fact."[29] In conjunction with these elements, the first prong of the *Craig* test is whether there is a public policy or state interest important enough to outweigh the defendant's constitutional right of confrontation.[30] And the second prong is whether the procedure in question preserves all the other elements of the Confrontation Clause.[31]

Notably, Justice Scalia, joined by Justice Brennan, Justice Marshall, and Justice Stevens, dissented.[32] Justice Scalia asserted that the rule that a "defendant

---

[27] *Maryland v Craig*, 497 US 836, 840; 110 S Ct 3157; 111 L Ed 2d 666 (1990).

[28] See *id.* at 844 ("We have never held, however, that the Confrontation Clause guarantees criminal defendants the *absolute* right to a face-to-face meeting with the witnesses against them at trial.") and *id.* at 847 ("[W]e have never insisted on an actual face-to-face encounter at trial in *every* instance in which testimony is admitted against a defendant.").

[29] *Id.* at 846.

[30] *Id.* at 851-852, 855.

[31] *Id.*

[32] *Id.* at 860-870 (Scalia, J., dissenting).

should be confronted by the witnesses who appear at trial is not a preference 'reflected' by the Confrontation Clause; it is a constitutional right unqualifiedly guaranteed."[33] Justice Scalia went on to say:

> The Court today has applied "interest-balancing" analysis where the text of the Constitution simply does not permit it. We are not free to conduct a cost-benefit analysis of clear and explicit constitutional guarantees, and then to adjust their meaning to comport with our findings. The Court has convincingly proved that the Maryland procedure serves a valid interest, and gives the defendant virtually everything the Confrontation Clause guarantees (everything, that is, except confrontation). I am persuaded, therefore, that the Maryland procedure is virtually constitutional. Since it is not, however, actually constitutional I would affirm the judgment of the Maryland Court of Appeals reversing the judgment of conviction.[34]

In our prior opinion in this case,[35] we noted that, like the United States Supreme Court in *Craig*, this Court has recognized that presenting testimony over closed-circuit television does not violate the defendant's right of confrontation in two special circumstances.[36] We analyzed a number of federal decisions and then went on to adopt the *Craig* test:

> Like the majority of federal courts that have examined this issue, we adopt the *Craig* test to determine whether a trial court infringes a defendant's right of confrontation when it allows witness testimony to be taken through two-way, interactive video technology. The trial court must hear evidence and make case-specific findings that the

---

[33] *Id.* at 863.

[34] *Id.* at 870.

[35] *People v Buie*, 285 Mich App 401; 775 NW2d 817 (2009).

[36] *Id.* at 409, citing *People v Pesquera*, 244 Mich App 305, 309; 625 NW2d 407 (2001), and *People v Burton*, 219 Mich App 278, 290-291; 556 NW2d 201 (1996).

procedure is necessary to further a public policy or state interest important enough to outweigh the defendant's constitutional right of confrontation and that it preserves all the other elements of the Confrontation Clause.[37]

While I see considerable intellectual merit in Justice Scalia's absolutist view of the confrontation clause— after all, the document does say, "In *all* criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him"[38]—I believe that our decision to adopt the *Craig* test in our prior opinion was a prudential one, given the prior decisions in *Burton* and *Pesquera,* and the precedent in *Craig* itself.

I also find significant that the prosecution concedes that in this case there was no public policy or state interest in having the witnesses in question testify by video. Therefore, despite the trial court's conclusory statements to the contrary, there is no basis on the record on which we could ground a holding that there was a public policy or state interest sufficiently important to outweigh Buie's constitutionally guaranteed right of confrontation. Further, although Buie's *counsel* may have consented to the video procedure pursuant to MCR 6.006(C)(2), she did so over Buie's express objection. Manifestly, then, it was plain error to permit the two witnesses in question to testify using the video procedure.

I fully recognize that the crimes in question here— criminal sexual conduct involving a victim under the age of 13,[39] three counts of criminal sexual conduct involving the use of a weapon,[40] and one count of

---

[37] *Id.* at 415.

[38] US Const, Am VI (emphasis added).

[39] MCL 750.520b(1)(a).

[40] MCL 750.520b(1)(e).

possession of a firearm during the commission of a felony[41]—are heinous ones. I further recognize that there was substantial evidence of Buie's guilt in this matter and that the video testimony of the two witnesses in question was crucial to establishing that guilt. And I finally recognize that others may assert that we base our decision to vacate Buie's convictions and sentence upon "technicalities."

But, while it is true that the Constitution is not a suicide pact,[42] it is also not a wish list. Nor can we modify it in lockstep with evolving technology. The words in our most fundamental formative documents have continuing meaning and it is our responsibility as members of the judiciary to ensure that such meaning has effective life. The web of protection that we have woven around those whom the state accuses, or may accuse, of crimes is at the center of our system of justice. It is one of the safeguards that distinguish that system from those despotic and tyrannical regimes in which political prosecutions and governmentally orchestrated sham trials are commonplace. A criminal defendant's right to confront witnesses face to face and to subject such witnesses to the test of cross-examination is not a technicality, it is crucial protection that has been with us almost from the very beginning of our republic. It may be waived, as MCR 6.006(C)(2) provides, but it cannot be judicially abrogated. Raleigh's ghost haunted the Framers and he haunts us still, to our great benefit.

---

[41] MCL 750.227b.

[42] See *Terminiello v Chicago*, 337 US 1, 37; 69 S Ct 894; 93 L Ed 1131 (1949) (Vinson, J., dissenting).